UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DANNY MCDONALD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:12 CV 1313 SNLJ/DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Danny L. McDonald for disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge be reversed and remanded for further proceedings.

## I. BACKGROUND

Plaintiff Danny McDonald, born on December 13, 1957, filed applications for Title II and Title XVI benefits on April 14, 2009. (Tr. 49-50.) He alleged an onset date of disability of August 1, 2008, due to illiteracy, a bullet lodged in his spine, depression, broken foot, and hypertension. (Tr. 155-63.) Plaintiff's applications were denied initially on October 14, 2009, and he requested a hearing before an ALJ. (Tr. 53-58.)

On September 14, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 8-16.) On May 24, 2012 the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL HISTORY

In 1966 and 1970, St. Louis Public Schools evaluated plaintiff's IQ as 72 and 73 respectively. He attended a special education program in school. He maintained cumulative grade point averages of .600 after his tenth grade year and .857 after his eleventh grade year. He graduated high school ranked seventy-ninth of eighty-one with a 1.313 cumulative grade point average. (Tr. 196-200.)

On May 18, 2007, plaintiff complained of intermittent chest pains that began three days earlier. The chest pains radiated to his left shoulder and caused shortness of breath. He reported cocaine use, smoking one pack of cigarettes per week, and drinking one pint of wine per day. His medications included Zoloft and Norvasc.[1] An electrocardiogram (EKG) revealed no acute changes. Dr. Shaukat Chaudhry assessed chest pain and substance abuse and referred him to another hospital for further evaluation. (Tr. 254-60.)

On August 22, 2007, plaintiff's employer sent him home from work due to elevated blood pressure. He received an EKG, which revealed sinus bradycardia and left ventricular hypertrophy.[2] (Tr. 275-76, 402.)

On October 22, 2007, plaintiff complained of pain in his great toes caused by a beam falling on them five days earlier. He reported more pain in his right foot. He also reported that three years earlier, he injured his right foot in a motor vehicle accident. His medical history included hypertension and depression. Dr. Ali Zarmeena assessed a

---

[1] Zoloft is used to treat panic attack, obsessive-compulsive disorder, posttraumatic stress disorder, and social anxiety disorder. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2013). Norvasc is used to treat high blood pressure. Id.

[2] Hypertrophy is the general increase in bulk of a part or organ. Stedman's Medical Dictionary, 929 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

closed fracture of the proximal phalanx of the right great toe. She advised him to avoid carrying excessive weight and referred him to an orthopedic specialist. She also wrapped his right foot and provided an orthopedic boot for it. (Tr. 245-47.)

On October 24, 2007, plaintiff complained that his right great toe caused him severe pain and forced him to leave work. He was diagnosed with a right great toe fracture and instructed to elevate his foot and not work for a week. (Tr. 238-43.)

On November 12, 2007, plaintiff complained of constant pain in his right foot, which he rated as 10 of 10. He reported that he broke his right toe by slipping on a curb near the beginning of October 2007. He further complained that he could not take his medication because it interfered with his ability to work. (Tr. 236.)

On December 23, 2007, plaintiff received X-rays on his right foot. Jess Poblete, M.D., found moderate to marked degenerative changes in the first metatarsophalangeal joint. (Tr. 426.)

On December 31, 2007, plaintiff complained of constant pain in his right foot that radiated to his low right leg, which he rated as 10 of 10. He reported that he broke his toe by slipping on a curb as he attempted to catch a bus. Plaintiff complained that he could not play drums or stand for extended periods of time, which his job required. He further complained that Tylenol 3 caused drowsiness and did not alleviate the pain. He received a diagnosis of severe arthritis. (Tr. 424.)

On January 3, 2008, Judith McGee, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. She found that his medically determinable impairments included depression and anxiety. She further found that he suffered mild restriction of daily living activities and mild difficulties maintaining concentration, persistence, and pace. She stated that his IQ had not been tested and that he worked despite his alleged impairments. She also stated that he could perform most daily living activities, had not been hospitalized, and received treatment from his primary care provider. She found his impairments not severe. (Tr. 261-72.)

On February 6, 2008, plaintiff complained of flu-like symptoms. Dr. Zarmeena noted that plaintiff scheduled surgery for his foot fracture for the following month. Plaintiff reported working for an interior design company but that he would not work until after surgery. (Tr. 419-23.)

On March 20, 2008, plaintiff complained of pain in his right great toe. John Weltmer, M.D., noted plaintiff's previous employment as a machine operator but that plaintiff had not worked since the preceding September. Plaintiff received X-rays on his right foot, which revealed first metatarsal phalangeal subluxation and degenerative changes and an Achilles tendon injury.[3] He assessed right hallux rigidus.[4] Plaintiff consented to surgery. (Tr. 281-84.)

On April 17, 2008, Dr. Weltmer performed a right hallus metatarsal phalangeal cheilectomy on plaintiff.[5] (Tr. 285-86.)

Plaintiff received notes from David Karges, D.O., and Dr. Weltmer stating that he could not work from May 2 to August 17, 2008. (Tr. 349-52.)

On February 22, 2009, plaintiff arrived at the emergency room and complained of a racing heart beat and pain in the left arm, shoulder, and chest. He stated that he drank half of a pint of bourbon gin to alleviate pain. He reported that the pain originated in his neck and left shoulder and radiated to his chest and arm and that the pain increased with movement, including lifting his arm and turning his head. He further stated that the pain began after a trip with his band when working on the ceiling of his house. He received X-rays on his chest and cervical spine, which revealed cardiac size at the upper limits of normal, a tortuous aorta, mild to moderate degenerative disc disease at C3-C6, and joint

---

[3] Subluxation is an incomplete dislocation. Stedman at 1856.

[4] Hallux rigidus is a condition in which stiffness appears in the first metatarsophalangeal joint. Stedman at 848.

[5] Cheilectomy is chiseling away bony irregularities at the margins of joint cavities that interfere with joint movement. Stedman at 356.

arthritis from C5-C7.[6]  Gregory M. Polites, M.D., opined that his symptoms did not have a cardiac origin and diagnosed acute alcohol intoxication with alcoholism and cervical degenerative disc disease.  (Tr. 361-84.)

On September 24, 2009, Arthur C. Littleton, Ph.D., performed a psychological evaluation on plaintiff.  Plaintiff reported to Dr. Littleton the following.  He graduated from a special education program in high school.  He last worked in 2007 through a temp agency as a machine operator that printed t-shirts.  He held the job for eighteen months.  He does not receive mental treatment other than prescriptions for psychotropic medications, and he previously abused alcohol.  He has few friends but no problems with family interactions.  He attends church regularly.  He feels depressed due to his inability to work.  He cries weekly, has difficulty sleeping, low energy, and limited interest.  His finances concern him.  Routine daily activities occasionally confuse him.  (Tr. 307-09.)

Dr. Littleton evaluated plaintiff's verbal IQ as 67, performance IQ as 70, and full scale IQ as 66.  He found significant limitations in vocabulary, reasoning, general knowledge, comprehension, and psychomotor speed.   He found plaintiff not competent to manage his finances.  He diagnosed adjustment disorder with depressed mood and gave a GAF of 48.[7]  (Id.)

---

[6] The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman at 2117-18.

[7] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worse of the two components.

A GAF score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a

On October 9, 2009, Robert Cottone, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. Dr. Cottone found that plaintiff's medically determinable impairments included adjustment disorder with depressed mood and significant subaverage general intellectual functioning with deficits in adaptive functioning, and valid verbal, performance, and full scale IQs between 60 and 70. He found that plaintiff suffered moderate restriction of daily living activities, mild difficulties with maintaining social functioning, and moderate difficulties with maintaining concentration, persistence, and pace. Dr. Cottone also found that plaintiff suffered no other conditions and abused substances. (Tr. 310-21.)

On October 9, 2009, Dr. Cottone also submitted a Mental Residual Functional Capacity Assessment form. He found plaintiff markedly limited in his ability to understand, remember, and perform detailed instructions, and moderately limited in his ability to maintain attention and concentration for extended periods, and in his ability to set realistic goals or plan independently. Dr. Cottone concluded that plaintiff could understand, remember, perform, and persist at simple tasks, make simple work-related decisions, adequately relate to coworkers and supervisors, and adequately adjust to ordinary changes in work routine or setting. (Tr. 45-48.)

On October 13, 2009, plaintiff arrived at the emergency room complaining of pain in his low left jaw. He reported that he drank more than five drinks per day. However, he left prior to meeting with a physician. (Tr. 354-60.)

On December 24, 2009, plaintiff complained of back pain due to a gunshot wound in his back from the 1970s, which he rated as 10 of 10. He reported that a bullet fragment remained in his back and that the pain gradually increased and radiated to his neck. Plaintiff also reported smoking one pack of cigarettes per week, drinking gin daily, and formerly using cocaine and heroin. Nicole Delsoin, M.D., assessed spinal enthesopathy,

---

job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000).

low back pain, nicotine dependence, and unspecified psychoactive substance abuse.[8] She opined that osteoarthritis caused his pain. X-rays of his cervical spine revealed minimal scoliosis, minimal degenerative disc disease at C5-C6 with an old spur fracture at C5, moderate degenerative disc disease at C6-C7, and healed compression fractures at C5-C6. X-rays of his lumbar spine revealed moderate scoliosis, minimal degenerative disc disease at T12 to L3, moderate degenerative disc disease at L3-L4, and a medium caliber bullet in the spinal canal at L4-L5. (Tr. 324-28.)

On January 14, 2010, plaintiff met with Dr. Delsoin to review his X-rays. She assessed osteoarthritis and backache and prescribed diclofenac sodium.[9] (Tr. 323-24.)

**Testimony at the Hearing**

The ALJ conducted a hearing on June 18, 2010. (Tr. 17-43.) Plaintiff testified to the following. He is fifty-two years old. He graduated from King High School, which was a special school for slow readers. He earned his grades through his work at a nursing home as a nurse's aide. He lives with his girlfriend in a house. (Tr. 22-23.)

He last worked through Excel's temporary employment service. He no longer works due to problems completing applications and the temporary employment service's lack of work. He also experiences difficulty with standing on his foot and with his back due to a bullet in his spine. Although the bullet lodged several years ago, the pain continues to increase. He broke his toe but did not immediately realize it. He eventually sought medical attention, and a physician wrapped it. He temporarily stopped working. Upon returning to work, which required him to stand, he found that he could not stand on his toe. He returned to the doctor and underwent surgery around March 2008. (Tr. 23-25.)

---

[8] Enthesopathy is a disease process occurring at the site of muscle tendon and ligament insertion into bones or joint capsules. Stedman at 649.

[9] Diclofenac sodium is used to relieve pain, swelling, and joint stiffness caused by arthritis. WebMD, http://www.webmd.com/drugs (last visited on April 30, 2013).

During a typical day, he sits around his house and may wash dishes. His girlfriend works. He cooks for himself when she works. He launders and occasionally attends church. He volunteers at homeless shelters. He no longer uses cocaine but continues to drink alcohol. Medical records indicate he tested positive for cocaine in February 2009, but he recalls that he last used six or seven years ago. He has reduced his alcohol consumption from one fifth per day to one pint per day. (Tr. 25-26, 29-30.)

On an average day, he can walk about one block before needing to sit. He can stand for only five to ten minutes. He cannot stand long enough to finish washing dishes, although he occasionally finishes washing them by standing on one leg. He feels pain when he sits and when he stands. He can sit for only ten minutes, although he owns a special chair at home that allows him to sit for longer periods of time. He can lift twenty to twenty-five pounds. (Tr. 26-27.)

He cannot afford pain medication. He drinks alcohol to alleviate his pain. He meets with doctors in the city, but they regularly cancel appointments. He usually takes medication for his blood pressure, although he forgot on the day of the hearing. He continues to take Zoloft. Zoloft is paid for three months at a time, and he must call for refills. He does not currently see a psychiatrist but saw one as young man. He continues to smoke. His girlfriend purchases cigarettes and gin for him. She cannot afford his pain medication. (Tr. 27-32.)

When sitting, he experiences pain from his low back to his neck daily and particularly when he moves or attempts to lift. He places heating pads on his back. His back pain continues to worsen. He lies down as much as he can, which is about eight hours a day. After his foot surgery, he returned to work in August 2008. He worked for twenty minutes before his employer terminated him. He received some income either due to disability or workers' compensation during this time. (Tr. 32-36.)

He no longer has a driver's license. He cannot get his license back until 2015 due to two DWIs. His last DWI occurred in Illinois six or seven years ago. He took the driving test three times before he passed it. (Tr. 36-37.)

Vocational expert (VE) Jeffrey Magrowski also testified at the hearing. Plaintiff previously worked as a furniture mover, which is very heavy, semi-skilled work. The ALJ presented a hypothetical individual with plaintiff's age, education, and work experience. The ALJ limited the individual to medium work and simple, unskilled tasks, and the individual could only occasionally climb stairs and ramps, never climb ropes, ladders, or scaffolds, could frequently balance, stoop, kneel, crouch, and crawl, and should avoid concentrated exposure to unprotected heights, excessive vibration, and hazardous machinery. (Tr. 39-40.)

The VE responded that such individual could not perform plaintiff's past relevant work. However, such individual could perform as a transporter, which is medium, unskilled work with about 500 positions in Missouri and about 25,000 positions nationally; some stock work, which is medium, unskilled work with about 5,000 positions in Missouri and about 200,000 positions nationally; and as a linen room attendant, which is medium, unskilled work with about 2,500 positions in Missouri and 125,000 positions nationally. (Tr. 40.)

The ALJ presented another hypothetical individual also with plaintiff's age, education, and work experience. The ALJ limited the individual to light, unskilled work, and the individual could only occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; cannot climb ropes, ladders, or scaffolds; and should avoid concentrated exposure to unprotected heights, excessive vibration, and hazardous machinery. (Tr. 40-41.)

The VE responded that such an individual could perform as a laundry bagger, which is light, unskilled work with about 1,000 positions in Missouri and over 50,000 positions nationally; some work as a small item packer, which is light, unskilled work with about 1,500 positions in Missouri and over 100,000 positions nationally; and some work as a bench assembler, which is light, unskilled work with about 2,000 positions in Missouri and over 100,000 positions in the national economy. (Tr. 41.)

## III. DECISION OF THE ALJ

On September 14, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 8-16.) At Step One of the prescribed regulatory decision-making scheme,[10] the ALJ found that plaintiff had not engaged in substantial gainful activity since August 1, 2008, the alleged onset date. At Step Two, the ALJ found that plaintiff's severe impairments were osteoarthritis, degenerative disc disease of the lumbar and cervical spine, alcohol abuse, borderline intellectual functioning, and mood disorder. (Tr. 10.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Id.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except that he can only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never climb ropes, ladders, or scaffolds; and must avoid concentrated exposure to excessive vibration, industrial hazards, and unprotected heights. The ALJ further restricted plaintiff to performing only simple tasks. At Step Four, the ALJ found that plaintiff had no past relevant work. (Tr. 11-14.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 15.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers

---

[10] See below for explanation.

evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009). A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

# V.  DISCUSSION

Plaintiff argues that the ALJ erred by failing to find that plaintiff satisfied the requirements of Listing 12.05 or that plaintiff suffered from the medical equivalent of Listing 12.05.

**A. Listing 12.05C**

> Listing 12.05C addresses mental retardation and states:
>
> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.  The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function

20 C.F.R. § 404 app. 1.

The ALJ did not discuss Listing 12.05.  However, an ALJ does not err when he "fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record."  Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

Plaintiff argues that the IQ scores obtained by Dr. Littleton show that plaintiff satisfies the IQ requirements of Listing 12.05C.  However, the ALJ found Dr. Littleton's IQ scores inconsistent with plaintiff's work activities. (Tr. 14.)  "An ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior."  Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001).  Performing semi-

skilled work is inconsistent with mental retardation. Hines v. Astrue, 317 F. App'x 576, 579 (8th Cir. 2009).

The record indicates that Dr. Littleton derived the IQ scores from a one-time examination as a non-treating psychologist. (Tr. 307-09.) The record also indicates that plaintiff worked for Federal Johnson Moving and Storage, which the VE classified as a semi-skilled work. (Tr. 39, 130.) Plaintiff also stated that he formerly had a driver's license, which he lost due to DWIs, passed the driver's license examination, volunteered at homeless shelters, prepared his own meals, left the house daily, used public transportation, shopped, attended church and block unit meetings, received social visits, got along well with authority figures, could handle changes in routine, performed ceiling repairs, and played drums with a band. (Tr. 25, 36-37, 167-75, 368-70, 424.)

Plaintiff argues that less evidence supports discounting his IQ scores than the claimant's IQ scores in the case cited by the Commissioner, Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004), where the Eighth Circuit held that the ALJ properly discounted the claimant's IQ scores. While arguably true, greater evidence supports the ALJ's finding in this case than in the cases cited by plaintiff, in which the Eighth Circuit found that substantial evidence did not support the ALJ's discount of claimants' IQ scores. See Douglas v. Astrue, 341 F. App'x 257, 259 (8th Cir. 2009) ("Although the ALJ rejected Douglas's low IQ scores as inconsistent with the record, we find that there is little in the record to contradict the scores."); Bailey v. Apfel, 230 F.3d 1063, 1065-66 (8th Cir. 2000) ("Furthermore, Bailey's daily activities and work history do not call into question the validity of the IQ results."). Accordingly, substantial evidence supported the ALJ's decision to discount Dr. Littleton's IQ scores.

Plaintiff argues that substantial evidence does not support the ALJ's finding that plaintiff performed semi-skilled work. Specifically, he argues that substantial evidence does not support that plaintiff worked as a furniture mover, as defined by the Dictionary of Occupational Titles, 1991 WL 688702 (4th ed., 1991) (DOT), and that the ALJ failed to

make explicit findings regarding the physical and mental demands of a claimant's past work.

Although neither the VE nor the ALJ cited the DOT, the DOT index includes only one entry for "furniture mover", DOT 995.687-014, which matches the description provided by the VE. (Tr. 39.) The DOT states the following brief description of the work required of the position:

> Assists VAN DRIVER (motor trans.) in loading and unloading moving van: Wraps dishes and fragile items in paper or corrugated cardboard and packs them in barrels. Rolls up rugs, removes pictures from walls, and loads furniture into van. Arranges articles in truck to form compact load, using ropes and padding to secure goods and prevent breakage. Performs other duties as described under HELPER (any industry) Master Title.

DOT 905.687-014. The DOT also states that moving furniture is semi-skilled work. Id.

The record indicates that plaintiff worked for Federal Johnson Moving and Storage. (Tr. 130.) Plaintiff also testified that he "moved stuff" during the course of his employment with Federal Johnson Moving and Storage. (Tr. 39.) The court finds that substantial evidence supports the ALJ's finding that plaintiff performed work as a furniture mover, and, therefore, semi-skilled work.

"The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work." Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999). "The ALJ may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the claimant's past work." Id. Typically, courts invoke this requirement to ensure that the ALJ correctly found that a claimant could perform past relevant work at Step 4. See e.g., Vincent v. Apfel, 264 F.3d 767, 769 (8th Cir. 2001); Lowe v. Apfel, 226 F.3d 969, 973 (8th Cir. 2000); Pfitzner v. Apfel, 169 F.3d 566, 568 (8th Cir. 1999). Nevertheless, the court finds that the ALJ sufficiently referred to a specific job description in the DOT associated with plaintiff's past work. Although the ALJ did not expressly refer to the DOT, as set forth above, the

DOT entry is readily ascertainable from the ALJ's description and as the sole entry of "furniture mover" in the DOT index.

Plaintiff also argues that his IQ scores from school support a finding that he meets the IQ requirements. However, these IQ scores do not fall within the parameters of Listing 12.05C. (Tr. 197.)

Plaintiff also argues that the ALJ failed to explain the weight afforded to Dr. Cottone's opinion, contending that it indicates that plaintiff satisfies Listing 12.05C. "An ALJ must explain in the decision the weight given to the opinions of a State agency medical consultant." Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(f)(2)(ii)). However, the record does not indicate that Dr. Cottone is a state agency medical consultant but indicates that he works for the Social Security Administration. (See Tr. 45-47, 310-21.)

Moreover, plaintiff specifically relies on Dr. Cottone's acceptance of Dr. Littleton's IQ scores. Although the ALJ did not discuss Dr. Cottone's opinion, as set forth above, substantial evidence supports the ALJ's decision to discount Dr. Littleton's IQ scores, which, in turn, supports discrediting Dr. Cottone's opinion. See Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). ("The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.").

Accordingly, plaintiff's argument is without merit.

**B. Medical Equivalent of Listing 12.05C**

Plaintiff also argues that the ALJ erred by failing to find his medical impairments medically equivalent to Listing 12.05C. "Although [Program Operations Manual System (POMS)] guidelines do not have legal force, and do not bind the Commissioner, this court has instructed that an ALJ should consider the POMS guidelines." Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003). Regarding medical equivalence, the POMS guidelines state "To determine that such a mental impairment does not meet but equals a listed

impairment, it must first be shown that the capsule definition of that impairment is satisfied." Social Security Administration, Program Operation Manual System, DI 24505.015, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056. It further provides that:

> The criteria for [Listing 12.05C] are such that a medical equivalence determination would very rarely be required. However, slightly higher IQ's (e.g., 70-75) in the presence of other physical or mental disorders that impose additional and significant work-related limitation of function may support an equivalence determination. It should be noted that generally the higher the IQ, the less likely medical equivalence in combination with another physical or mental impairment(s) can be found.

Id.

The ALJ accepted plaintiff's IQ scores of 72 and 73 from school as valid. (Tr. 13, 197.) However, the ALJ did not discuss whether plaintiff suffered deficits in adaptive functioning.

> The term "adaptive functioning" refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. Indicators of adaptive behavior include childhood developmental milestones (e.g., when did the individual first crawl, walk, tie shoes, feed/dress self, etc.), as well as educational and social achievements.

Social Security Administration, Program Operation Manual System, DI 24505.015.

Even assuming the ALJ properly found plaintiff not credible and properly discounted Dr. Littleton's report, the record contains additional evidence that plaintiff suffered from deficits in adaptive functioning. Plaintiff's school records indicate that plaintiff struggled in school and attended a special education program. (Tr. 196-200.) Further, an interviewer submitted a Disability Report-Field Office form regarding plaintiff, which indicated that plaintiff could not understand the records he brought with him and could not read. (Tr. 153.) Courts have found that similar facts supported that a claimant suffered deficits in adaptive functioning. See Christner v. Astrue, 498 F.3d 790,

794 (8th Cir. 2007); Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006); Rodgers v. Astrue, 2010 WL 3385086, *17 (D. Minn. 2010).

Furthermore, the standard for determining whether an impairment is severe mirrors the standard for determining whether the "additional and significant work-related limitation of function" requirement of Listing 12.05C is satisfied. See Maresh v. Barnhart, 438 F.3d 897, 900 (8th Cir. 2006). The ALJ found that plaintiff's severe impairments included osteoarthritis, degenerative disc disease of the lumbar and cervical spine, alcohol abuse, and mood disorder. (Doc. 10.)

Because the record supports finding that plaintiff suffered deficits in adaptive functioning and the ALJ accepted plaintiff's IQ scores from school and found additional severe impairments, the court should remand the Commissioner's decision to the ALJ for reconsideration. On remand, the ALJ should expressly discuss the POMS guidelines regarding whether plaintiff has an impairment or combination of impairments that medically equals Listing 12.05C, including adaptive functioning deficits.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be reversed and remanded for further proceedings under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

　　　　　　　　　　　　　　　　　　　　/S/   David D. Noce　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　**UNITED STATES MAGISTRATE JUDGE**

Signed on May 9, 2013.